THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. FLOYD RICHARDSON, Appellant.

*Opinion filed March 23, 1988.—Rehearing denied October 3, 1988.*

CLARK, J., dissenting.

James J. Doherty, Paul P. Biebel, Jr., and Randolph Stone, Public Defenders, Aaron L. Meyers, Assistant Public Defender, and Carey Berman, law student, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Kenneth T. McCurry and Paula Carstensen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CUNNINGHAM delivered the opinion of the court:

In a seven-count indictment returned in the circuit court of Cook County, defendant, Floyd Richardson, was charged with the murder of George Vrabel (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)), in the course of the forcible felony of armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(3)). Prior to trial, the People nol-prossed three armed violence counts. Defendant presented a written waiver as to his right to have a jury determine whether or not he should receive the death penalty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d)(3)), and the circuit court found that this waiver was knowing and voluntary. Following a jury trial, verdicts were returned finding defendant guilty on the charges of murder, felony murder, and armed robbery. At the request of the People, a death penalty hearing was held before the court. The circuit court found the existence of an aggravating factor set forth in section 9—1(b) of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)), and found that there were no mitigating factors sufficient to preclude a sentence of death. The circuit court, therefore, sentenced defendant to death on the murder charges. Additionally, the court imposed an extended term of 60 years' imprisonment for the armed robbery conviction. The sentence was stayed (107 Ill. 2d R. 609(a)) pending appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603).

Testimony at trial established that on April 1, 1980, around 10 p.m., Shirley Bowden was working at Twin Foods and Liquors at 2251 East 79th Street in Chicago

and conversing with some employees in the liquor department when she noticed a man standing inside the store by a display near the department, towards the rear of the store. The store was empty, except for five clerks and one other customer. She testified that she noticed the man because he was huddled up with his coat collar turned up, despite the fact that it was not that cold outside. Miss Bowden described the man she saw as wearing dark pants, a pea coat, and a winter skullcap. Miss Bowden testified that, as she was returning to her register in the food department at the front of the store, the man passed within four feet of her as he walked back into the liquor department, where George Vrabel worked as a clerk. She then heard a shot, followed by the warning, "Stay down mother f——r. This is a stickup. Stay down." Bonnie Williams, another employee of the store working at a register in the food department at the time, testified that she was told someone was robbing the store and ducked behind the counter, getting up when she heard a shot. Both women looked toward the liquor department to see a man reaching behind the counter taking money out of the register. The man turned from the liquor counter and ran back to the front door of the store, passing both Bowden and Williams; the women observed him at close range but ducked behind the counter as he approached their counter and exited the store. Williams testified that she could see his face only a few feet away from her, describing him as a tall, medium-built black with a medium complexion, wearing a skullcap and glasses. Neither woman could state the precise length of the encounter but both estimated that some 10 to 15 seconds elapsed between the time the first shot was fired and the point at which the gunman left the store. After the gunman had fled, Bowden contacted the police, then went to the liquor department and found Vrabel lying on the floor behind the

counter, bleeding. Police arrived and removed Vrabel to the hospital, where he was pronounced dead upon arrival.

Bonnie Williams testified that, in the summer of 1982, she selected defendant's photo from a group of black-and-white photos the police showed her. Shirley Bowden stated that she had never been called to view a lineup. Both women stated that they had seen defendant in the neighborhood prior to April 1, 1980, and both identified defendant at trial as the gunman.

Dr. Shaku Teas, a licensed forensic pathologist, testified that she performed an external examination and an autopsy on George Vrabel. She testified that Vrabel died of a bullet wound to the chest, which severed the aorta and lodged in the muscle behind the right shoulder blade. She noted that the bullet wound and the surrounding tissue contained an amount of gunpowder residue indicating a distance of a few inches to two feet between the firearm and the wound.

Ernest Warner is a firearms examiner for the City of Chicago police department and was qualified by the court as an expert witness. He described to the jury the procedures he employs to compare bullets to determine whether or not they were fired from the same gun, using class characteristics common to all guns produced by a particular manufacturer and individual characteristics unique to each particular firearm. He identified fired bullets recovered from George Vrabel's body and from the wall of a cooler in the Twin Foods Store. He also identified a bullet recovered by the physician who treated Thomas Fitzpatrick for a gunshot wound to the abdomen, after an armed robbery in his tavern on April 5, 1980. Although the murder weapon itself was never recovered, the firearms examiner testified that all three bullets had been fired from the same gun, where they bore the same class and individual characteristics. The

witness did not specify the individual characteristics relied upon in reaching his conclusion.

Thomas Fitzpatrick testified that on April 5, 1980, around 1:30 a.m., he was at his tavern located at 7159 South Exchange Street in Chicago, approximately one mile from the location of the murder four nights earlier. As he was standing at the cash register behind the bar opposite the entrance 15 to 20 feet away, a man entered waving a gun at him. The assailant said "This is a stickup" and jumped over the bar, shooting Fitzpatrick in the back when Fitzpatrick attempted to run. Fitzpatrick crawled to a hallway lit by a fluorescent light. As Fitzpatrick lay on the ground face up, the assailant stood over him and asked him where the rest of the money was, but departed when Fitzpatrick told him there was no more money. Fitzpatrick stated that he was fully conscious during the encounter and estimated the man stood over him for 15 to 20 seconds in the hallway. The witness testified that in May of 1982, he tentatively identified defendant as the gunman, after viewing a series of six photographs. Fitzpatrick added that when he viewed a subsequent physical lineup, he was positive that defendant was the gunman. The witness identified defendant in court as his assailant.

Ray Slagle testified that on April 5, 1980, he preceded another individual through the front door of Fitzpatrick's bar. When someone "hollered" to him, he moved toward a partition separating the poolroom from the rest of the bar; when he got to the partition, he heard shots, at which point he stepped behind the partition and looked out at the bar. At this point, he observed the man who had followed him inside rifling the cash registers behind the bar. The gunman was in the tavern several minutes, during which time Slagle stuck his head out from behind the partition three or four times to see what was happening; as the gunman ran toward the

exit, Slagle threw a chair at him. He described the gunman as a black male, 5 foot 9 inches to 5 foot 10 inches tall, of slender build, with medium complexion, wearing a brownish maroon jacket and a cap with a bill. Slagle's description of the assailant as having a scraggly beard coincided with defense witnesses' testimony that defendant was incapable of growing the full beard depicted by the police composite created from descriptions by witnesses to the Vrabel murder. Slagle testified that he selected defendant's picture out of a photographic array shown to him by police in September 1982; he also testified that he identified defendant in a physical lineup on October 5, 1982. Slagle identified defendant at trial as the gunman.

Sergeant James Sanders of the Chicago police department testified that on May 4, 1982, he received a radio broadcast of a robbery in progress at 1640 East 79th Street. While proceeding to that location, the sergeant heard a broadcast describe the assailant as a male black, approximately 5 foot 9 inches to 5 foot 11 inches tall, weighing 160 pounds, with a large Afro hairstyle. The sergeant testified that, when he reached the vicinity of the crime, he observed an individual matching the description and took him into custody for the investigation of that armed robbery. The sergeant then identified defendant in court as the individual he took into custody.

Detective Joseph Dijiacomo testified that, as a Chicago police officer assigned to Area 2 Violent Crimes, he had conducted the follow-up investigation into the Vrabel homicide. He stated that defendant became a suspect in the Vrabel murder when his physical description matched the description of the offender; the circuit court sustained a defense objection to the testimony and, at defense counsel's request, struck the comment from the record and instructed the jury to disregard it. Dijiacomo then testified that upon his review of the daily crime re-

ports in May of 1982, he examined a case report on an armed robbery on East 79th Street, and thereby obtained a photograph of defendant. He and his partner, Detective John Solecki, first prepared a series of six black-and-white photos and then a series of six color photos of men roughly fitting the description given of the Vrabel suspect. Beginning in May 1982, Dijiacomo and Solecki showed the black-and-white photos and then, in September, the color photos to the witnesses in each of the 1980 armed robberies.

Detective John Solecki was called as a defense witness. He testified that in the early morning hours of April 2, he was called to the scene of the Vrabel homicide. After refreshing his memory from a police report, he testified that he had sent a teletype message describing the suspect as wearing a full, trimmed beard. Additionally, he testified that, in the summer of 1982, he had assembled a group of six black-and-white photographs and had shown these to Fitzpatrick and Slagle in the course of his follow-up investigation, despite the fact that defendant was in custody. Solecki testified that after examining those photographs both Fitzpatrick and Slagle identified defendant as the April 5 gunman. Solecki indicated, however, that Fitzpatrick and Slagle requested a physical lineup so that they could be absolutely certain of their identification. He testified that both witnesses positively identified defendant at the physical lineup on October 5, 1982.

Arkonia Richardson, defendant's mother, testified for the defense that defendant had never had a full beard, only a mustache and goatee. After this testimony, the defense rested.

We turn first to defendant's contention that the circuit court improperly admitted evidence of the armed robbery on May 4, 1982, and the shooting of Thomas Fitzpatrick on April 5, 1980. Evidence of crimes for

which a defendant is not on trial is inadmissible if relevant merely to establish his propensity to commit crime. (*People v. Lindgren* (1980), 79 Ill. 2d 129, 137.) Such evidence overpersuades the jury, which might convict the defendant only because it feels he is a bad person deserving punishment. (79 Ill. 2d at 137.) However, other-crimes evidence is admissible if relevant for any purpose other than to show the propensity to commit crime, such as *modus operandi*, intent, identification, motive, or absence of mistake. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) Nevertheless, circuit courts must not use this broad standard of admission to bypass the principal portal of admissibility, *i.e.*, the relevance of the evidence to the proof of some fact at issue in the case. Where the grounds for the relevance of a piece of evidence are speculative at best, admission should be denied. *People v. Lindgren* (1980), 79 Ill. 2d 129, 140.

The testimony relating to the April 5, 1980, shooting of Thomas Fitzpatrick was highly relevant and admissible. Although defendant maintains that significant differences existed between the April 1 and April 5 crimes (*i.e.*, the assailant in the Vrabel murder did not enter the store waving a gun, did not jump over the counter, used profanity in requesting money and was not described as wearing a full, trimmed beard), we have never suggested that other crimes must be identical to the crime charged before evidence of them is admissible. (See *People v. Taylor* (1984), 101 Ill. 2d 508, 521.) The evidence of the April 5, 1980, shooting clearly tended to identify defendant as the perpetrator of the April 1, 1980, murder, in light of the evidentiary links between the two crimes. Expert testimony at trial established that the same gun fired the bullet which killed Vrabel and the bullet which wounded Fitzpatrick. Further, the testimony defendant sought to exclude included eyewitnesses to the April 5 shooting identifying defendant as the gunman. Testi-

mony that defendant was the man holding that particular weapon during a solo armed robbery on April 5 is clearly relevant to the determination of whether he was the man holding the weapon on April 1, when it was used to kill George Vrabel. Defendant's speculation that the same gun could have been passed from one person to another, perhaps among gang members, is completely unsupported by the record and does not require a contrary conclusion.

The dissent contends that there was insufficient evidence to establish that the same gun was used in both the April 5 incident and the April 1 incident, and that therefore evidence of the April 5 incident should have been excluded. Specifically, the dissent contends that the expert's testimony that the same gun was used in both incidents lacked foundation. In this regard we note that at trial defendant failed to object to the supposed lack of foundation. Accordingly, he has waived this objection. (*People v. Smith* (1985), 106 Ill. 2d 327.) Moreover, as explained below, use of the expert's testimony in this regard, if erroneous, did not involve a plain error affecting substantial rights. Accordingly, defendant cannot raise the issue on appeal. 107 Ill. 2d R. 615.

With regard to identification of the bullets in question, the expert testified that the basis for firearms identification is the similarity in the reproduction of the class *and individual* characteristics. He identified various class characteristics common to the bullets involved herein, and he explained that class characteristics are characteristics common to certain types of weapons. He further stated that class characteristics "are useful to us in eliminating weapons as opposed to identifying them."

He also explained the meaning of "individual" characteristics. He stated that such characteristics are characteristics unique to a firearm due to microscopic imperfections in the metal of the barrel. He further explained

that each bullet fired through the barrel of a weapon picks up a reverse impression of these unique microscopic imperfections. He testified that the presence of the same individual characteristics on two different bullets is determined by examining the bullets side by side under a comparison microscope. He also testified that he performed this procedure with respect to the bullets here in question, and following that examination concluded that the bullets were fired from the same gun. While he was not asked to describe what identical imperfections in the bullets existed, we believe it sufficient that he concluded that such identical imperfections existed. Specifying what those imperfections looked like would have added little, if any, probative value to his testimony. In our view, his testimony, when considered in its entirety, contains sufficient foundation for the conclusions which he reached.

Moreover, if defendant had any genuine basis to doubt that the same individual imperfections existed on both bullets he could have objected to the conclusion reached during direct examination or, at the very least, he could have gone into the matter during cross-examination. He did neither, and consequently he is precluded from arguing the matter on appeal.

Defendant's assertion that evidence regarding the April 5 offense was presented in such detail as to unnecessarily prejudice defendant is also unfounded. As noted in *People v. Butler* (1975), 31 Ill. App. 3d 78, 80, "[w]hen evidence of other offenses is admissible on the question of identity it should be confined to such details as show the opportunity for identification and not the details of the crime." Upon examination of the record, it appears that the People elicited no more detail than was necessary to establish the opportunity Fitzpatrick and Slagle had on April 5 to view the gunman, as well as their physical condition at the time. Moreover, even if

some of the detail was not essential, the detailed evidence clearly did not constitute prejudicial and reversible error. See *People v. McKibbins* (1983), 96 Ill. 2d 176, 186-87.

Although the People assert numerous grounds for admitting evidence of the May 4, 1982, armed robbery, we find no justifiable basis for its admission. Contrary to the People's assertion, the evidence was not admissible merely to show how the investigation unfolded and how defendant came into custody. These purported bases for admission beg the critical question of relevance to prove defendant's commission of the crimes in issue and are not supported by our prior decisions. For example, in *People v. McKibbins* (1983), 96 Ill. 2d 176, cited by the People, this court affirmed the admission of evidence detailing the events of the defendant's arrest when discovered in the act of robbing a jewelry store, but only where the evidence was also relevant to specifically connect the defendant with the crimes for which he was being tried, a robbery and murder which had occurred two days earlier. (96 Ill. 2d at 184.) The circumstances of the jewelry store robbery tended to establish that the defendant had participated in the earlier murder with the necessary criminal intent. (96 Ill. 2d at 186.) In the present case, however, the People have not established any "threshold similarity" between the May 4 arrest and the April 1 murder which might render the circumstances of the former offense probative of the latter (see *People v. Bartall* (1983), 98 Ill. 2d 294, 310) nor did the circuit court find that defendant's apprehension as a suspect in the the armed robbery on May 4, 1982, tended to identify him as the armed robber on April 1, 1980. Further, the evidence regarding defendant's apprehension was not relevant as part of a "continuing narrative" of the original crime, since it clearly related to a separate,

distinct, and disconnected crime. See *People v. Marose* (1957), 10 Ill. 2d 340, 343.

The People assert without elaboration numerous other grounds for admitting evidence relating to the May 4, 1982, armed robbery, including knowledge, intent, motive, opportunity and identity. Although we recognize that these are legitimate bases for admitting other-crimes evidence, we find no facts making these bases applicable to the May 4, 1982, incident.

The error in admitting evidence of the May 4, 1982, armed robbery does not require reversal. Although we noted in *People v. Lindgren* that "erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal" (*People v. Lindgren* (1980), 79 Ill. 2d 129, 140), our Supreme Court Rule 615(a) (107 Ill. 2d R. 615(a)) states: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." This doctrine may apply when the error itself was unlikely to have contaminated the jury. (*People v. Butler* (1974), 58 Ill. 2d 45, 48-49.) In *Lindgren*, the jury had heard an "extensive discussion" of the collateral crime of arson, and we stated that "in such cases" the conviction could be affirmed "only if the record affirmatively shows that the error was not prejudicial." (*Lindgren*, 79 Ill. 2d at 141.) The record before us confirms that the testimony relating to defendant's 1982 arrest, albeit irrelevant, disclosed only the fact that police had apprehended defendant as a person matching the description of a suspect sought in connection with an armed robbery. There was no "extensive discussion" of the collateral crime, and the strict result of *Lindgren* should not obtain here. (79 Ill. 2d at 141.) Further, the evidentiary ambiguities present in *Lindgren* (79 Ill. 2d at 141) are not present in this case, where there was positive and credible identification evidence from several witnesses implicating defendant in the murder of George

Vrabel. Where it does not appear that justice has been denied or that a finding of guilt resulted from an error, we will not reverse a defendant's conviction. (*People v. Morehead* (1970), 45 Ill. 2d 326, 332.) Therefore, for the aforementioned reasons, the admission of limited evidence of the May 4, 1982, robbery does not require a reversal of the defendant's conviction.

Defendant also objects (in his supplemental brief) that the jury was improperly instructed on the use and weight of the other-crimes evidence. He contends that the jury should have been specifically instructed to compare the characteristics of the April 1, 1980, and April 5, 1980, offenses and determine whether the offenses were sufficiently similar to permit a reciprocal inference of identity.

The instruction given pertinent to this objection is as follows:

> "Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment. This evidence has been received solely on the issue[s] of defendant's identification [and the manner in which he came to police attention in this case]. This evidence may be considered by you only for the limited purpose for which it was received." (Illinois Pattern Jury Instructions, Criminal, No. 3.14 (2d ed. 1981) (bracketed material added by the People).)

Defense counsel objected to the phrase "in which he came to police attention in this matter," offering as an alternative the phrases "when he was arrested," or "came into custody." Defendant did not object to the instruction as it pertained to the April 5, 1980, offense, and failed to raise the alleged instruction error in his motion for a new trial. This failure to further object to a jury instruction at trial or to include it in a motion for a new trial serves as a waiver of a right to claim on appeal

that the instruction was erroneous. *People v. Caballero* (1984), 102 Ill. 2d 23, 41.

In raising this particular objection to the above-quoted jury instruction for the first time on appeal, defendant relies upon our Rule 451(c), which provides that "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." (107 Ill. 2d R. 451(c).) He contends that the instruction given improperly assumed the probative value of the April 5, 1980, offense and thereby precluded the jury from determining the probative value of crucial evidence. However, the jury was instructed that they were to determine the weight to be given to the testimony of each witness. (Illinois Pattern Jury Instructions, Criminal, No. 1.02 (2d ed. 1981).) Viewing these instructions together, we find that the jury was properly instructed regarding the other-crimes evidence; there most certainly was not a substantial defect by which defendant was denied due process. The duty to evaluate the weight and credibility of the testimony of each witness includes the duty to evaluate the weight and credibility of the identification testimony. We agree with the People that the circuit court was "not required to give an instruction that would provide the jury with no more guidance than that available to them by application of common sense." See *People v. McClellan* (1978), 62 Ill. App. 3d 590, 595-96.

In evaluating defendant's contention regarding the jury instructions, we find inapposite *Crane v. Kentucky* (1986), 476 U.S. 683, 90 L. Ed. 2d 636, 106 S. Ct. 2142, upon which defendant relies. In *Crane* the trial court had found the defendant's confession voluntary, had admitted evidence of it, and then had erroneously precluded the defendant from explaining the circumstances surrounding it. The *Crane* trial court thus had withheld from the jury evidence which might have caused it to

question the confession's probative value. The Supreme Court in *Crane* found that "the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." (476 U.S. at 690, 90 L. Ed. 2d at 645, 106 S. Ct. at 2146.) In contrast to *Crane*, defendant herein was neither precluded from introducing favorable evidence nor prevented from disputing or disproving unfavorable evidence. The jury heard the evidence of both offenses, and heard defense counsel's arguments that there was no credible evidence sufficient to connect defendant to either the April 1 or the April 5 shooting or to connect each shooting with the other.

Defendant next argues that the circuit court's limitation of defense counsel's examination of police officers on the motion to suppress identification evidence violated defendant's constitutional rights and requires a new suppression hearing, since counsel was attempting to establish the suggestiveness of the photographic identification procedures employed. Pursuant to a prosecution objection, the circuit court allegedly requested defense counsel to limit his questioning of the officers who had arranged a photographic identification to the procedures rather than the results of the identification, foreclosing the defense from showing an "utterly crucial" form of suggestiveness: the words used by the police as the photos were displayed.

Defendant misinterprets the record of the hearing on the motion to suppress the photographic identifications. During the hearing, defense counsel questioned the officer who had conducted the follow-up investigation, Detective Solecki, as follows:

"Q. [MR. McELLIGOTT, Assistant Public Defender]: Now, Officer, specifically as to defendant's Exhibit Number One, could you tell me exactly what you and the witness, starting with Thomas Fitzpatrick, talked about

when that photo of Floyd Richardson was displayed to him?

A. Whom am I showing it to?

Q. Thomas Fitzpatrick.

A. We asked him if he could recognize anybody in the group of photographs as a person involved in the shooting, this robbery of his tavern.

Q. What, if anything, did he say?

A. He went through the photographs and picked out Floyd Richardson as the person who looked like the person who shot him and committed the armed robbery.

Q. That was a tentative identification, is that correct?

A. Correct, sir.

Q. Officer, in looking over the photos, use the words that you used with Mr. Morgan.

A. The same. It involved the incident of Mr. Vrabel and whether he could recognize anyone involved in the offense.

MR. LAZZARO [Assistant State's Attorney]: Your Honor, I am going to object what *any of the witnesses* may have said.

THE COURT: I am not concerned about what they did say. I am concerned about the procedure, if that is what you're talking about. *The issue is not the reliability of the testimony or credibility of the testimony.* It is whether or not there is a suggestive procedure, so therefore, I ask you to limit it to the procedures rather than the results.

MR. McELLIGOTT: Fine. May I then ask how the photos were shown to Miss Williams?

A. I just handed them to her.

Q. Miss Cox?

A. Just handed to her." (Emphasis added.)

In context, this colloquy reflects the court's interest in hearing the words and procedures used by the officers, rather than in the specific responses given by the eyewitnesses while viewing the photo lineups. Defense counsel was in fact able to question Detective Solecki as to what

he said to the witnesses when presenting them with the photographs. The circuit court did not foreclose defendant's attempt to establish suggestiveness.

Defendant submits several additional challenges to the photographic identifications, contending that they were so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243; *Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) Defendant posits several suggestive features of the photo identifications: police used two series of photos, with defendant's photo the only one common to both series, for display to prospective witnesses; and the photo of defendant used in the series showed him with significantly more hair than the other men depicted.

The determination as to whether a pretrial confrontation in a specific instance is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] was denied due process *** depends on the totality of the circumstances surrounding it." (*Stovall v. Denno* (1967), 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206, 87 S. Ct. 1967, 1972.) Defendant bears the burden of proving that such a confrontation resulted in a denial of due process. *People v. McMath* (1970), 45 Ill. 2d 33, 36, *cert. denied* (1970), 400 U.S. 846, 27 L. Ed. 2d 83, 91 S. Ct. 92.

The two series of photographs used in the identification procedure (photographs which were in defendant's care) were lost prior to appeal. The circuit court, however, reviewed both series and stated that there was nothing suggestive about the photographs themselves, noting that "they are remarkably similar, even to their facial hair or mustaches and goatees." This court will normally defer to a lower court's factual finding (*People v. Cox* (1972), 53 Ill. 2d 101, 108), and given the facts

here, we cannot conclude that defendant has established the photographs' suggestiveness. See *People v. Brown* (1972), 52 Ill. 2d 94.

Testimony at the suppression hearing and at trial supports our conclusion. In May of 1982, police assembled a black-and-white array of six photographs, including a photograph of defendant, and showed the photographs to Thomas Fitzpatrick, William Morgan, Bonnie Williams and Pearl Cox, individually in their homes. No lineup was then held, as defendant was hospitalized for injuries received when apprehended on May 2, 1982; on July 14, 1982, the police attempted to conduct a physical lineup at the Cook County jail, but defendant threw himself on the ground, covered his head and refused to participate. Police then obtained a color photograph of defendant, compiled a second array of six photographs, and showed this array to Fitzpatrick, Pearl Cox, and Ray Slagle, among others. The police officers testified at the suppression hearing that each array contained six photographs of different subjects, who were similar to defendant in age and appearance. The record does not reflect that the police in any manner directed attention to defendant's photograph, or in any manner suggested that he was the one who committed the crimes. The witnesses individually viewed the photographs and identified defendant from among them. The police officers as well as the witnesses were cross-examined regarding the photographic identification.

Defendant also contends that the procedure at an October 5, 1982, physical lineup was unfair, for several reasons. First, he argues that he had an "Afro hairstyle," which set him apart from the other lineup participants. Second, he contends that four witnesses who had participated in the photo identifications, including Bonnie Williams and Thomas Fitzpatrick, met in a group in the State's Attorney's office on September 28, 1982, a few

days prior to a lineup, to discuss their earlier identifications of defendant.

Defendant has failed to prove that the physical lineup procedure was impermissibly suggestive. (*People v. Blumenshine* (1969), 42 Ill. 2d 508, 511-12.) While it was arguably improper for the assistant State's Attorney to gather witnesses to discuss their identifications of defendant, the group did not review the photographs, and Thomas Fitzpatrick was the only trial witness who attended this meeting and then viewed the physical lineup. Additionally, the circuit court found that there was nothing suggestive about the lineup itself; a photograph of the physical lineup has been included in the record on appeal, and we agree with the court's conclusion. Participants in a lineup need not be physically identical (see *People v. Thompson* (1981), 93 Ill. App. 3d 995, 1007), and defendant's "Afro" hairstyle was not so distinctive that it rendered the lineup suggestive.

Assuming, *arguendo*, that any of the pretrial identification procedures were impermissibly suggestive, the three trial witnesses who participated either in a photo identification (Bonnie Williams, Thomas Fitzpatrick and Ray Slagle) or the physical lineup (Fitzpatrick and Slagle) could nonetheless testify regarding those pretrial identifications. The identifications were admissible because the totality of circumstances clearly and convincingly establishes that those identifications had an independent origin in the witnesses' memories of events at the time of the crime. (*People v. McTush* (1980), 81 Ill. 2d 513; *People v. Bryant* (1983), 94 Ill. 2d 514.) Factors relevant to this determination include: the witness' opportunity to view the suspect at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the suspect, the witness' level of certainty demonstrated at the confrontation, the length of time between the crime and the confrontation,

and the witness' acquaintance (if any) with the suspect prior to the crime. 94 Ill. 2d at 520-21.

Bonnie Williams observed the gunman when he was removing money from the victim's cash register. He turned and ran directly towards her counter position as he headed for the door. All of her attention remained focused on the robbery and the robber. The gunman made no attempt to conceal his features and Williams was able to give police a detailed description of him. She was further able to positively identify defendant from the first array of photos, although two years had passed since the murder. Further, the witness testified that she had seen defendant prior to the crime. Likewise, Thomas Fitzpatrick had an excellent opportunity to view his assailant, focusing his attention as defendant entered the bar waving the gun, as he jumped over the counter, and as he stood over Fitzpatrick in the well-lit hallway. The description of the assailant which Fitzpatrick gave to police apparently coincided with the composite photo they had developed of the suspect in the Vrabel murder. Although Fitzpatrick's identification of defendant from the photo array was tentative, he stated only that he wanted to see a lineup to be sure. He testified that he was positive at the physical lineup that defendant was his assailant. Finally, Ray Slagle viewed defendant for several minutes as the gunman entered the bar, as he rifled the cash registers, and as he ran through the bar to make his escape. Slagle's attention was clearly focused on the gunman when Slagle threw a chair at him. Slagle gave a detailed description of the assailant and identified defendant from the photographic arrays.

Thus, even if the identification procedures were impermissibly suggestive, defendant was not denied a fair trial by the use of the out-of-court identifications of these trial witnesses, all of whom had an excellent opportunity to observe defendant and were able to recount

in detail what he said and did. Moreover, because the witnesses' out-of-court identifications were reliable, their in-court identifications were properly admitted. *People v. Bryant* (1983), 94 Ill. 2d 514, 521.

At the time of the October 1982 lineup, defendant was under indictment only for the May 1982 armed robbery, not for either the April 1, 1980, or April 15, 1980, shootings to which the lineup pertained. Nevertheless, defendant next contends that since he was under indictment (albeit for a separate offense), the sixth and fourteenth amendments dictated that he be permitted the presence of counsel. He maintains that since he had no counsel present, the lineup identifications should have been suppressed.

This court addressed a similar issue in *People v. Martin* (1984), 102 Ill. 2d 412. The defendant in *Martin* had been arrested and jailed on a rape charge but, while in custody, was questioned by police concerning an unrelated murder and made several incriminating statements. The defendant in *Martin*, much like defendant in this case, argued that his sixth amendment right to counsel had attached when he was arrested on the rape charge and that the subsequent conduct of the police with respect to the murder charge, in the absence of his counsel, violated the sixth amendment. This court noted that "*Massiah* [*v. United States* (1964), 377 U.S. 201, 206, 12 L. Ed. 2d 246, 250, 84 S. Ct. 1199, 1203,] does not stand for the proposition *** that once a defendant is indicted for one offense, his sixth amendment right to counsel is activated for purposes of any subsequent offense." (102 Ill. 2d at 421.) This court concluded that the attachment of the sixth amendment right to counsel on charges for which adversary judicial proceedings had been initiated did not activate the defendant's sixth amendment right with respect to any other crimes for which defendant had not yet been charged. (102 Ill. 2d at 423.) Defendant

has offered no grounds to distinguish *Martin,* nor do we find any, and we conclude that our ruling in *Martin* is dispositive of the issue.

Defendant next contends that he was not proved guilty beyond a reasonable doubt of the murder of George Vrabel. He points out that no physical evidence connected him with the crime and argues that the People's case was built on only two witnesses' uncertain identifications, made over two years after the crime. According to defendant, the trial testimony of these witnesses (Bowden and Williams) indicated that they had only extremely brief periods of time in which to observe the assailant and was far short of being clear and convincing.

It is settled law that when the identification of the defendant forms the central question in a criminal prosecution, the testimony of even one witness is sufficient to convict where the witness is credible and viewed the accused under conditions permitting a positive identification to be made. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 226; *People v. Williams* (1975), 60 Ill. 2d 1.) The credibility of witnesses is for the jury to assess, and a court of review will not set aside a jury's verdict unless the evidence presented at trial is so improbable as to raise a reasonable doubt of guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 227.) Further, we have held that minor inconsistencies in testimony do not, of themselves, create reasonable doubt. (*People v. Adams* (1985), 109 Ill. 2d 102, 115.) A reading of the record indicates that the identifications made by the two witnesses to the Vrabel murder were sufficiently positive, where both witnesses had sufficient time to view defendant during the commission of the crime and where they had seen defendant in the neighborhood prior to the crime. Further, the ballistics evidence and identification evidence arising out of the Fitzgerald shooting four days later

supports the identification of defendant in this case. The evidence leaves no reasonable doubt as to defendant's guilt. *People v. Yarbrough* (1977), 67 Ill. 2d 222.

Defendant next asserts that certain comments made in the course of the prosecution's closing argument improperly shifted the burden of proving innocence to the defense, while others were impermissibly inflammatory. First, defendant maintains that the prosecution's suggestion to the jury that the witnesses involved in the case were equally available to both sides invited the jury to draw negative inferences from the defendant's asserted failure to call witnesses listed in the discovery motion. Defendant argues that the prosecution's suggestion also implied that the defense had failed to meet its burden of proof, when it was instead the prosecution's burden to prove guilt beyond reasonable doubt.

During closing arguments, defense counsel stated:

"MR. McELLIGOTT [Defense counsel]: But you can't base a very important decision on 'Maybes,' or 'Could have been,' or, 'Might have been,' and only partial evidence. I don't believe, ladies and gentlemen, that the State has given you enough.

You know the number of witnesses here. You know what you want, what you should have been given. I don't believe you have been given everybody that should have been given. I don't believe you have been given enough to make a finding beyond a reasonable doubt."

Shortly thereafter, the People responded:

"MR. LAZZARO [Assistant State's Attorney]: *** Mr. McElligott [defense counsel] I think pretty finely honed in on one issue we are dealing with, the identification issue, and we are dealing with the evidence that came from the witness stand.

*** Counsel states that the police with their investigation—He asked them and they talked to a few people, and at the start of this trial Judge Marovich read every juror a list of names.

And that was a list of names that was furnished as discovery in this case. A list I gave to the Court and to them in January of 1983.

MR. BABB [Defense Counsel]: It's not evidence.

\* \* \*

THE COURT: I don't know what the argument is yet, counsel. Go ahead.

MR. LAZZARO: A list that goes on forever. It's a list of people that the police officers talked to. It's a list that we talked to. It's a list that I presume the defense counsel talked to.

And some people are in positions to perceive and some aren't. Some hear a shot and they turn and they ran and they don't look.

MR. McELLIGOTT: Objection, Your Honor. Now this is not evidence.

THE COURT: Mr. Lazzaro, move on to the argument from the evidence and inferences to be drawn therefrom.

MR. LAZZARO: Thank you."

Shortly after this exchange, the prosecution commented, "There is not a single person anywhere involved in this case that is not equally available to both sides." Ordinarily, the People may not comment on a defendant's failure to call witnesses. (*People v. Holman* (1984), 103 Ill. 2d 133, 151.) However, such comments are permitted when, as here, they are made solely in response to defense counsel's own reference to the People's failure to call those witnesses. 103 Ill. 2d at 151-52.

Defendant's second allegation of improper argument during the People's closing relates to a comment made by the assistant State's Attorney: "The day for Tom Fitzpatrick is when this man shot him in the back and stood over him." Defendant maintains that the prosecution was urging the jury to give Tom Fitzpatrick his "day in court," even though defendant was not on trial for the assault on Fitzpatrick, thus rendering it likely that the jury was convicting defendant not simply for

the murder of George Vrabel, but also for the assault on Tom Fitzpatrick.

Defendant has removed the comment from its proper context and thus distorted its meaning and significance. As noted earlier, a defendant may not claim prejudice from comments by the prosecutor when those comments were invited by defendant's argument. (*People v. Lewis* (1962), 25 Ill. 2d 442, 446.) Further, the credibility of witnesses is a proper subject for closing argument. (*People v. Bryant* (1983), 94 Ill. 2d 514, 524; *People v. Wallace* (1981), 100 Ill. App. 3d 424, 432.) Defense counsel had attacked the credibility of the People's witnesses in his closing argument by suggesting that they could not remember clearly events which had occurred more than two years earlier. The People responded in closing by suggesting to the contrary that perhaps there was some particular event in each juror's life which was so shocking that they would always remember the smallest details about it, and that for Thomas Fitzpatrick, that day was the day the gunman burst into his bar and shot him in the back. Clearly, the People's comment was merely an invited observation on the credibility of Fitzpatrick's identification testimony and not a request to punish defendant for the crime committed against Thomas Fitzpatrick. We find no error.

Having found no error sufficient to merit reversal of defendant's convictions for murder and armed robbery, we affirm those convictions. We next consider defendant's allegations of error in the sentencing phase of the proceeding.

Defendant waived a jury for sentencing, and the required hearing (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d)) was conducted before the trial court. Subject to defendant's trial objections, the parties stipulated to the use of the trial evidence in aggravation. Based upon the trial evidence, the court found beyond a reasonable doubt the

existence of a statutory aggravating factor, namely, that defendant committed the murder in the course of an armed robbery. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)(a).) Then, pursuant to section 9—1(c) of the Code (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)), the court heard evidence of additional aggravating factors as well as mitigating factors.

The People presented testimony from arresting officers as to seven offenses for which defendant was arrested but for which either leave to file charges was denied or the charges were dismissed. The People also introduced testimony of defendant's two prior convictions for armed robbery, as well as testimony of defendant's prior convictions for felony theft, possession of a controlled substance and unlawful use of a weapon. The People also presented evidence of other offenses for which charges were still pending. The witnesses included officers involved in the investigations and in some cases the victims themselves. In addition, detailed testimony concerning the circumstances of defendant's arrest on May 4, 1982, for an armed robbery was presented, including testimony by the victim and the arresting officer, who shot defendant through the hand when he appeared to be reaching for a gun.

Defendant presented two witnesses in mitigation, his common law wife, Victoria Smith, and his mother, Arkonia Richardson. Smith, the mother of defendant's five-year-old and three-year-old sons, stated that defendant loved her and that he has tried to make a better life for his family but that the world did not accept him. Defendant's mother testified that her husband was killed at work while defendant was a teenager and that, after his father's death, defendant helped look after his brothers and sisters while his mother worked. Defendant took the stand and denied shooting either George Vrabel or Thomas Fitzpatrick.

After hearing the evidence of aggravating and mitigating factors, the court concluded that there were no statutory or nonstatutory mitigating factors sufficient to preclude imposition of the death penalty. The court therefore sentenced defendant to death.

Defendant first argues that he was penalized for exercising his constitutional right to trial by jury, since the People made a pretrial offer of a 50-year prison sentence (which defendant rejected) but then sought the death penalty after defendant was convicted. Defense counsel has acknowledged that nearly a year before the plea bargain was offered he was aware that the People intended to seek the death penalty. Moreover, before the plea bargain was offered defendant filed a motion to bar the death penalty. Therefore, since the record unequivocally establishes defendant's knowledge that if he rejected the plea bargain the People would seek the death penalty, his reliance upon *People v. Walker* (1981), 84 Ill. 2d 512, is misplaced. When the defendant in *Walker* rejected a plea bargain, he had been misled as to the possibility that he would face a death sentence. 84 Ill. 2d at 515.

We see no meaningful distinction between the circumstances surrounding the plea bargain offer here and the circumstances in *People v. Lewis* (1981), 88 Ill. 2d 129, 148-49. The defendant in *Lewis* claimed that he was penalized for rejecting a plea bargain and exercising his right to trial (following which he was convicted and sentenced to death). The court rejected the defendant's claim, since he had elected to stand trial while fully aware that he faced a possible death sentence, and since there was no indication of either prosecutorial vindictiveness or a desire to punish the defendant for exercising his right to trial. We reject defendant's contention here for these same reasons.

There is no merit to defendant's next contention that the People failed to establish beyond reasonable doubt a

statutory aggravating factor supporting his eligibility for the death penalty. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6).) Defendant argues that there exists a reasonable hypothesis of ineligibility where the Vrabel shooting could have occurred for reasons unrelated to armed robbery. He argues that there is no evidence that any words or gestures indicated a robbery before the first shot was fired.

A defendant found guilty of murder may receive the death sentence if the murder was committed "in the course of" an armed robbery. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)(c).) Testimony established that the gunman who shot George Vrabel announced a stickup as he fired his first shot, then rifled the cash register and ran from the store. Just as the phrase "in the course of" does not require that defendant complete one of the other felonies in order to be eligible for the death sentence (*People v. Ramirez* (1983), 98 Ill. 2d 439, 458), we also believe that it does not require that the armed robbery commence prior to the fatal gunshot, since the precise timing of the offenses is not necessarily indicative of defendant's intent. The jury concluded beyond a reasonable doubt that defendant committed both a murder and an armed robbery, which offenses occurred essentially simultaneously. The trial testimony and verdicts sufficiently support the court's finding that the murder occurred "in the course of" an armed robbery.

Defendant next challenges the court's imposition of the death penalty on the grounds that the circuit court failed to make a finding beyond reasonable doubt regarding the intent elements necessary to support a death sentence. Defendant, however, did not object in the circuit court to the alleged omission and has thus waived consideration of the issue. (*People v. Carlson* (1980), 79 Ill. 2d 564, 575-76.) We decline to invoke the "plain error" exception to the waiver rule (107 Ill. 2d R. 615(a)),

for we do not feel that substantial justice has been denied defendant. 79 Ill. 2d at 577.

Clearly, though not explicitly referencing section 9—1(b)(6) of the Code (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)), the court found beyond reasonable doubt that defendant committed murder in the course of an armed robbery after reaching the age of 18. The court explicitly stated that therefore the required aggravating factor existed. We believe that implicit in these findings is the court's conclusion beyond reasonable doubt that defendant committed the murder with the requisite intent, an intent which the evidence overwhelmingly established. The court's implicit conclusion is even clearer from a statement made during the subsequent consideration of mitigating factors. In addition to the mitigating factors specifically relating to the death penalty (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)), the court considered mitigating factors set forth in section 5—5—3.1 of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.1), including "that the defendant did not contemplate that his conduct would cause or threaten serious physical harm to another." In considering this factor the court stated, "Obviously, that's not the evidence." Clearly, the court considered that the intent requirement of section 9—1(b)(6) had been proven beyond reasonable doubt. Thus, defendant was not denied substantial justice.

Defendant next contends that the prosecutor engaged in unsupported and inflammatory arguments at the sentencing hearing. Defendant complains of the prosecutor's statement that defendant not only robbed a man, "but completed the act by urinating on him for his own sheer enjoyment"; defendant maintains that this extremely prejudicial comment has no factual basis in the record and is grounds for a new sentencing hearing. Defendant also objects to the prosecution's comment in rebuttal

that defendant had reached for a gun at the time of his arrest and was prepared to kill the arresting officer.

Defendant failed to object to the allegedly improper argument. We again decline to grant relief from the waiver rule, since we can say neither that the evidence was closely balanced nor that substantial justice was denied. (*People v. Carlson* (1980), 79 Ill. 2d 564, 577.) Although the prosecutor may not argue matters unsupported by the evidence (see *People v. Holman* (1984), 103 Ill. 2d 133), a trial court is presumed to recognize and disregard incompetent matters presented to it (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 66). While the prosecutor's first comment was improper, this presumption will apply, since the circuit court had heard the testimony of the victim to whom the assistant State's Attorney referred. The prosecutor's comment that defendant was armed and prepared to kill his arresting officer was not improper, since it was a legitimate inference from the evidence that defendant had been armed only moments before the officer spotted him and had not had an opportunity to dispose of the gun. *People v. Yates* (1983), 98 Ill. 2d 502, 532-33.

We next consider defendant's contention that the circuit court improperly admitted at sentencing the testimony regarding seven alleged offenses which had not resulted in convictions. The evidentiary rules applicable to a determination of guilt differ from those applicable at sentencing. When considering aggravating and mitigating factors pursuant to section 9—1(c) of the Code (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c)), a sentencing judge may consider all relevant and reliable testimony. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 364.) Moreover, we have specifically held that testimony involving misconduct not resulting in prosecution may be reliable and relevant to sentencing. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 495.) Further, the evaluation of testimony's rele-

vance and reliability is left largely to the sentencing judge's discretion. *People v. Brisbon* (1985), 106 Ill. 2d 342, 365.

The evidence in question encompasses seven offenses, including three disorderly conduct charges, two assault charges, and one charge each for theft and arson. Clearly, this evidence was relevant to the sentencing phase, as it related to defendant's criminal history. (*People v. Brisbon*, 106 Ill. 2d at 365.) Moreover, we are convinced that the testimony regarding the seven other offenses was reliable, since testifying officers (whom defendant cross-examined and whose testimony he had the opportunity to rebut) witnessed three offenses and spoke with complaining witnesses regarding the other four offenses. The hearsay nature of reliable evidence does not bar its admission at sentencing. See *People v. Brisbon*, 106 Ill. 2d at 365; *People v. La Pointe* (1981), 88 Ill. 2d 482, 498.

We thus conclude that the circuit court did not abuse its discretion in admitting evidence of the seven offenses for which defendant was arrested but not convicted. Moreover, any error in this respect was harmless beyond reasonable doubt, since when sentencing defendant the court repeatedly emphasized that the only criminal offenses on which he relied were those for which defendant was convicted. See *People v. Stewart* (1984), 101 Ill. 2d 470, 494.

We have on prior occasions reviewed and rejected claims that the death penalty statute (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) is unconstitutional as cruel and unusual punishment and as a violation of separation of powers principles (in its granting to the prosecution the sole power to seek the death penalty). We decline to reconsider these issues, since defendant has offered no reasons to depart from these decisions. (*People v. Walker* (1985), 109 Ill. 2d 484, 508; *People ex rel. Carey v. Cous-*

*ins* (1979), 77 Ill. 2d 531, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603.) Likewise, defendant has given us no reason to reconsider our decisions holding that the death penalty statute is constitutional even though it does not provide for "proportionality of review" (*People v. King* (1986), 109 Ill. 2d 514, 551; *People v. Brownell* (1980), 79 Ill. 2d 508), and we decline to do so here. Finally, we decline for similar reasons to reconsider our decisions holding that the sentencing authority is not required to make written findings on the existence or nonexistence of aggravating and mitigating factors relied upon in imposition of the sentence. *People v. Gaines* (1981), 88 Ill. 2d 342; *People v. Brownell* (1980), 79 Ill. 2d 508.

Defendant additionally challenges the constitutionality of the death penalty statute on the grounds that it places the "burden of nonpersuasion" on defendant at the sentencing hearing. This court recently rejected similar arguments in *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445-46, and we will adhere to our reasoning in that case. *People v. Montgomery* (1986), 112 Ill. 2d 517, 534.

Finally, defendant contends that the death penalty statute is unconstitutional because it requires the "automatic" imposition of the death penalty when the sentencing authority finds that there are no mitigating factors sufficient to preclude imposition of the death penalty. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(h).) Defendant argues that the Constitution requires the sentencing authority to determine that death is the "appropriate" punishment (*Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954) and that the statute precludes such a determination. We cannot agree; we have recently stated that, under the statute, "[a] finding that no mitigating factor or factors are sufficient to preclude imposition of the death penalty is synonymous with a finding that death is the appropriate penalty." (*People v. Montgomery* (1986),

112 Ill. 2d 517, 534.) The record clearly shows that the circuit court carefully considered any possible mitigating factors before concluding that there were none sufficient to preclude the death penalty, and that the court deemed the sentence appropriate. We cannot conclude that the statute, either on its face or as applied to defendant, is "constitutionally defective," where it has not precluded the sentencing judge from determining that the death penalty is the appropriate penalty under the specific facts of this case. 112 Ill. 2d at 534.

For the reasons stated herein, the judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, May 18, 1988, as the date on which the sentence of death entered in the circuit court of Cook County is to be implemented. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE CLARK, dissenting:

In affirming the defendant's convictions and his death sentence, the majority reaches two conclusions with which I must disagree. First, it holds that the State, as part of its case in chief, properly placed before the jury evidence that the defendant committed an attempted murder and armed robbery that occurred four days after the charged crimes. Second, the majority holds that it was harmless error for the State to then place before the jury evidence of the defendant's arrest for yet an-

other armed robbery, this one occurring over two years after the offenses for which the defendant was on trial.

The majority accurately recites the rules governing the admissibility of other-crimes evidence. Evidence of offenses for which a defendant is not on trial is inadmissible if relevant only to show the defendant's disposition or propensity to commit crimes. (*People v. McKibbons* (1983), 96 Ill. 2d 176, 182; *People v. Lindgren* (1980), 79 Ill. 2d 129, 137.) The rationale for the general rule of exclusion is that "[t]he law distrusts the inference that because a man has committed other crimes he is more likely to have committed the current crime." (*People v. Lehman* (1955), 5 Ill. 2d 337, 342.) The admission of other-crimes evidence thus overpersuades the jury, creating the risk that it will convict a "bad man" who deserves to be punished not because of the crimes charged, but because of his other criminal misdeeds. Evidence of other crimes is, however, admissible if it tends to prove a fact in issue; *e.g.*, motive, intent, identity, or *modus operandi*. *People v. McDonald* (1975), 62 Ill. 2d 448, 455.

The majority holds that the extensive evidence the State presented concerning the April 5, 1980, attempted murder and armed robbery was properly admissible because it tended to identify the defendant as the perpetrator of the murder four days earlier, the crime for which the defendant was being tried. According to the majority, the State properly introduced detailed evidence of the April 5 crimes because its ballistics expert "established that the same gun" fired the bullet which killed the murder victim and the bullet which wounded the victim of the April 5 crimes. (123 Ill. 2d at 339.) The majority's assertion is entirely without force.

The record shows that the State's expert testified only to the various class characteristics which the two bullets shared. Class characteristics are those characteristics, like bullet caliber, which can establish that bullets

are of the same type and have thus been fired from the same *type* of weapon, but which cannot establish that two bullets have been fired from the same weapon. The witness stated that he examined the bullets for individual characteristics. The witness explained that microscopic imperfections in a barrel of a particular weapon will impart unique impressions, or individual characteristics, on fired bullets such that two bullets fired from the same gun will exhibit uniquely identical individual characteristics. Then, and without testifying to what, if any, identical individual characteristics were observable on the two bullets, the witness stated that in his opinion they had been fired from the same gun.

In my view, the complete absence of any factual basis on the record for the opinion of this witness renders it an opinion without foundation, and one wholly unreliable and unverifiable in its conclusion. Further, the State's failure to establish what, if any, individual characteristics there were common to the bullets cannot be deemed a technical omission, excusable under the circumstances. The evidence which the witness never testified to was absolutely crucial to the opinion the State elicited from him and without it there was no reliable basis or foundation for that opinion. The record thus belies the majority's claim that the State "established" that the gun used to murder the victim was the same gun used in the April 5 armed robbery and attempted murder.

Because the State failed to establish the very evidence essential to prove that the bullets had been fired by the same gun, it was error for the State to call the victim and an occurrence witness to the April 5 crimes, both of whom testified that the defendant was the assailant. Exposing the jury to the details of these irrelevant crimes could only have prejudiced the defendant. In fact, the full magnitude of the State's error in so doing can only be appreciated when viewed, as it was by the jury,

together with the evidence the State introduced to show that the defendant was arrested over two years later for an unrelated, third armed robbery.

The majority concedes that there was "no justifiable basis" for the State's introduction of evidence of the May 4, 1982, armed robbery. (123 Ill. 2d at 342.) Indeed, the evidence did not tend to prove identity, knowledge, motive, opportunity, or any other fact in issue. Nor was the evidence of the May 1982 offense admissible to show how the defendant was apprehended, as the State otherwise argues. Our decisions have never recognized such an exception to the general rule requiring that other-crimes evidence be excluded. I therefore agree with the majority that the admission of this evidence was error. Unlike the majority, however, I cannot agree that the error was harmless.

In *People v. Lindgren* (1980), 79 Ill. 2d 129, 140, this court observed that because the erroneous admission of other-crimes evidence carries a high risk that the jury will view the demonstrated propensity to crime as evidence that the defendant is guilty of crimes charged, the error "ordinarily calls for reversal." Only if the record affirmatively shows that the error was not prejudicial will the defendant's convictions be allowed to stand. (*Lindgren*, 79 Ill. 2d at 141.) The majority acknowledges that *Lindgren* holds that the erroneous admission of other-crimes evidence will ordinarily require a new trial, and then attempts to offset the *Lindgren* rule by quoting a part of Supreme Court Rule 615(a), this court's codification of the plain error rule. (123 Ill. 2d at 343.) The majority's reliance on Rule 615(a) to blunt the requirements of *Lindgren* is woefully misplaced.

The majority notes that, unlike the evidence of the April 5 crimes, the State's evidence of the defendant's arrest for the May 1982 armed robbery was not an "extensive discussion" of its details. (123 Ill. 2d at 343.) Nev-

ertheless, the jury was permitted to hear the evidence of both collateral armed robberies, and the one cannot be viewed in isolation of the other. Viewed together, these irrelevant crimes demonstrated the defendant's propensity to commit armed robberies, the very same offense underlying the murder for which he was being tried. Because evidence of more than one collateral crime was admitted, I find the error here far more egregious than that present in *People v. Lindgren* (1980), 79 Ill. 2d 129, where evidence of only one other crime was erroneously allowed to go to the jury. The evidence of these irrelevant and unrelated crimes formed a sideshow, serving to distract the jury from the real issues in this case. The evidence, moreover, was devastating in its portrayal of the defendant as a malignant "bad man" deserving of punishment. Having reviewed the record, I cannot with any confidence agree that the prejudicial errors did not work an injustice or materially contribute to the jury's verdicts. The prejudice resulting from the State's parade of irrelevant other-crimes evidence in this case was extreme and served to deny the defendant a fair trial.

For the reasons stated, I would reverse the defendant's convictions and vacate his sentence of death. I therefore dissent.