THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD McCLELLAN, Defendant-Appellant.

First District (1st Division)   No. 77-492

Opinion filed July 5, 1978.

592

Ralph Ruebner and David Mejia, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BUCKLEY delivered the opinion of the court:

This is an appeal from a criminal conviction of murder and armed robbery. For the reasons stated below, the judgment of conviction is affirmed.

The defendant, Ronald McClellan, was indicted jointly with Wilbur Cain for the September 12, 1974, shotgun murder and armed robbery of Robert Dietz, a mail carrier. After a jury trial in the circuit court of Cook County, McClellan was found guilty of murder and armed robbery and was sentenced to concurrent terms of 200 to 600 years and 25 to 75 years. Cain was found guilty of armed robbery and sentenced to a term of from 10 to 30 years.

At McClellan's trial the defense presented no witnesses. Testimony for the prosecution included the following:

Robert Haas testified on direct examination that on September 11, 1974, he, Cain, Jim Price, Jody Akers and Glenn Nelson were on the front porch of Cain's apartment building at Sunnyside and Paulina in Chicago drinking beer and wine when McClellan approached. McClellan introduced himself and said he was staying with the family next door. McClellan and Cain then left the porch and the remaining men moved

indoors. Subsequently Cain and McClellan returned. Haas then sat in a chair and fell asleep.

Around 9:30 in the morning, Cain woke Haas. Nelson was sleeping on a couch in the apartment and McClellan was also there. Cain told Haas he wanted to use Nelson's car to go to a liquor store. Haas had the keys to that car and said Cain could use the car if he went with him.

Cain drove with McClellan in the front passenger seat and Haas in the back seat. After 15 or 20 minutes Haas leaned forward to ask McClellan why they hadn't yet stopped at a tavern, and when he did so he noticed the barrel of a shotgun protruding from under the front seat. Haas asked McClellan why the shotgun was in the car and McClellan said he was going to drop it off at a friend's house. A short time later, McClellan began talking about wanting to do a stickup. Haas said he wanted no part of it and McClellan turned around and told him that if he wanted no part of it he should just lay back and be cool.

On Damen Avenue near Belmont Haas noticed a mail carrier's cart on the sidewalk and heard McClellan tell Cain to pull over, that he wanted to rob the mail carrier. When the car pulled over, Haas could see the upper part of the mail carrier's body in the hallway of an apartment building. Cain and McClellan got out of the car, and Cain stood on the sidewalk while McClellan took the shotgun into the hallway. Haas then heard a shot and McClellan came running out of the building with the shotgun in his hand. The two men got into the car and drove it away.

McClellan had a wallet in his hand, from which he took some bills. He then threw it out a window. Cain asked McClellan why he had shot the mail carrier and McClellan replied it was an accident.

They returned to Cain's apartment and parked the car in back. McClellan and Cain got out, McClellan carrying the shotgun, but Haas remained in the car, not wanting to be seen with them, and fell asleep. About an hour later, Haas went to Cain's apartment and there saw Cain waving the shotgun around in front of someone. Haas grabbed the weapon and threw it in a garbage can.

Later, Jody Akers and Glenn Nelson returned to the apartment, then Haas and Nelson left.

Haas also stated that he had been convicted twice of misdemeanor theft and that he had voluntarily been residing in protective custody since the shooting incident.

On cross-examination, Haas said he had been drinking beer and wine until about 4 a.m. on the morning of September 12 and that he did not remember telling two police officers on or about September 16 that he had been drinking until 9:30 a.m. He said the police officers did not tell him he was under arrest or investigation and that he "did not run" when the police came to arrest Cain.

When provided with a copy of the statement he had given to police at the police station, Haas said, "I guess that they told me I was under investigation for the crime," at the time the written statement was taken, September 16, but that on September 15 they had merely asked about the incident and he had said he knew nothing about it because he "did not want to be involved."

Haas also answered questions regarding the relative comfort of his witness quarters and said no promises had been made to him by the police and no deals were made with the state's attorney regarding his testimony. He added that he did not remember testifying at a preliminary hearing that he did not see McClellan take the gun with him after parking the car behind Cain's apartment.

Jim Price testified in substantial accord with Haas' testimony regarding events on the evening and early morning hours before the shooting incident. He also stated that, at 11 a.m. of the day of the shooting, Cain visited him at home and said he was in trouble. Cain was upset and said he went out to get some drinking money and that somebody got shot in the back. Cain left the apartment, saying he had to go get a gun before somebody else got hurt. Later, Cain returned and asked Price to come with him to see the shotgun. Price said he did not want to see it.

Jody Akers, who said Cain was her boyfriend, testified that she was at Cain's apartment around 11 a.m. on the day of the shooting and saw McClellan come in carrying a brown paper sack over his shoulder. After McClellan left, Cain told her he was really in trouble this time and took two $10 bills out of his pocket, saying it was all he had gotten. During that afternoon she went to the back porch of Cain's apartment, removed a shotgun from the garbage can, and placed it in a closet in her home. On September 15, police came to her home and removed the shotgun.

Akers said on cross-examination that the police had threatened her "with up to 20 years if I did not cooperate with them" and had told her they would give her money and move her out of the State if she did cooperate. She said, however, "they didn't put words in my mouth."

On redirect examination, she stated that the brown paper sack McClellan had been carrying was shaped like a shotgun.

During the course of her testimony, Akers also repeated certain statements made to her by Cain which are discussed below, along with other evidence pertinent to the issues raised by defendant in this appeal.

When the case came to trial, it was apparent that certain admissions made by Cain regarding his activities in concert with McClellan could prove damaging to McClellan. A motion to sever Cain's case from McClellan's was made and denied, based on the representation of the prosecution that all such statements would be excised from testimony of State witnesses. Also, a motion *in limine* was made to keep out evidence

regarding a robbery allegedly committed by the co-defendants the night of September 11. This motion was granted.

On appeal, defendant asserts error in three matters which arose at trial.

Defendant first contends that it was error for the court below to refuse a tendered instruction to the jury on the legal effect on a witness' credibility of prior conduct inconsistent with his testimony.

The basis urged for this instruction is that the prosecution's chief witness, Haas, testified that he "did not run" when police entered the apartment to arrest Cain, yet it was stipulated by the parties that there is an entry in a police report that states that Haas "attempted to run" when police entered the apartment.

At the outset, defendant's argument in favor of this jury instruction requires consideration of whether any inconsistency between testimony and conduct was in evidence. Because an attempt to run does not necessarily involve running, even if it were accepted as a fact that Haas "attempted to run," this prior conduct would not necessarily be inconsistent with his testimony that he "did not run."

Secondly, the record reflects that the parties stipulated only that the police report so characterizing Haas' conduct existed, and not that the report was accurate or even that the author of the report, if called as a witness, would testify that he saw Haas attempt to run. The jury was given no information as to the identity of the party making the statement or the basis for making the statement and thus was unable to determine whether the author witnessed the events reported or on what other basis the statement was written.

In sum, it is on the one hand unclear whether the police report version of Haas' conduct is "inconsistent" with Haas' version, and on the other hand, there was no basis provided for the jury to believe that the police report version was accurate. Accordingly, when the circuit court refused the tendered jury instruction on prior inconsistent conduct, saying there was "no evidence" of prior inconsistent conduct, that action could be grounded on either the absence of inconsistency or the absence of credible evidence of the correctness of the report alleged to be inconsistent with Haas' testimony that he did not run.

■■ An instruction regarding the credibility of a witness' testimony in the light of inconsistencies is a cautionary instruction, and trial courts have considerable discretion in deciding whether to issue such instructions, particularly where the inconsistency is doubtful. (*People v. Miller* (1975), 31 Ill. App. 3d 436, 446, 334 N.E.2d 421, 429.) Also, courts are under a general obligation to avoid giving instructions which unduly emphasize one part of the evidence in a case (*People v. Rhodes* (1969), 41 Ill. 2d 494, 499, 244 N.E.2d 145, 148), and are not required to give an instruction that would provide the jury with no more guidance than that available to them

by application of common sense. *People v. Heflin* (1978), 71 Ill. 2d 525, 376 N.E.2d 1367.

■■ Here, the giving of the requested instruction would have entailed express recognition by the court of the evidentiary significance of the stipulation by the parties that the police report existed, an issue short-circuited by the agreement of the prosecution to the stipulation. Accordingly, the court could properly decide in its discretion that giving the proferred instruction would give undue prominence to the stipulation.

■■ Moreover, omission of this instruction cannot be said to have left the jury without adequate guidance. It is obvious to the layman that any contradiction of a witness' testimony calls into question the accuracy of that testimony, and if that testimony is disbelieved as to one matter, the veracity of the remainder is cast in doubt. Additionally, the jury was instructed that evidence is to be evaluated in the light of the circumstances of the case, so that jurors' attention was called to their freedom to compare the various forms of evidence in the case, and it may be assumed that their reaction to any contradictory evidence would be to question the truthfulness of the contradictory sources.

Finally, the credibility of Haas as a witness was already made an issue by virtue of his prior inconsistent statements to police. Haas testified that he had, at first, given police one version of his involvement in the events in question, then changed his mind and told them "the truth," and explained his reasons for changing his story. This matter was before the jury and they were properly instructed on it.

Because this issue was closely linked to the issue raised by the stipulated police report of Haas' earlier attitude toward the police, it is reasonable to believe that the jury's resolution of the issue of prior inconsistent statements would have been paralleled in their handling of the question of prior inconsistent conduct.

We believe that the issuance of the requested instruction was a matter within the discretion of the trial court, and that in view of the need to avoid unduly emphasizing particular evidence and the needlessness of giving an instruction that merely provides additional verbalization of principles of which the jury is already apprised, the court below was well within its discretion in refusing to give this instruction.

Next, defendant asserts that prejudicial error was caused by testimony of witness Jody Aker in which she recounted statements by co-defendant Cain using the word "they" in reference to conduct associated with robbery.

One of the statements complained of was a response to a question whether Cain had told her he had taken the money he had showed her. She replied, "he said they got it," and, in response to a reworded form of

the question, she stated, "he said that's what they got." Both of these responses were stricken.

The other statement complained of was her testimony that, while watching a television news program reporting the murder of a mail carrier, Cain said to her, "that is what they were involved in or maybe it wasn't." Objection to this statement by counsel for the defendant was overruled.

The first of these exchanges was extremely vague. The fact that this co-defendant indicated it was "they" who obtained it, does not necessarily mean that the other co-defendant was involved. Moreover, upon objection by defense counsel, these statements were promptly stricken from the record and the jury instructed to disregard them.

■■ As the defendant points out, these statements violated the rule that, in an admission by one defendant at trial, references to another defendant must be excised (*Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620; *People v. Strayhorn* (1965), 35 Ill. 2d 41, 43, 219 N.E.2d 517, 519), but because they were vague and not directly responsive to the question, such statements could be remedied by sustaining an objection to them and instructing the jury to disregard them. *People v. Kirkwood* (1959), 17 Ill. 2d 23, 31, 160 N.E.2d 766, 771-72, *cert. denied* (1960), 363 U.S. 847, 4 L. Ed. 2d 1730, 80 S. Ct. 1620; *People v. Johnson* (1973), 11 Ill. App. 3d 745, 749, 297 N.E.2d 683, 686.

■■ The other reference, however, was in context more clearly indicative of involvement in an armed robbery, and objection to it was overruled. The word "they," though not conclusively including defendant McClellan, could certainly have been so interpreted. (See *People v. Smith* (1973), 15 Ill. App. 3d 10, 304 N.E.2d 50; *People v. Brown* (1972), 7 Ill. App. 3d 748, 289 N.E.2d 452.) Accordingly, failure to strike this reference was error.

■■ A co-defendant's admission, however, is not necessarily so prejudicial as to require reversal if the State's case would not have been significantly less persuasive without the admission. (*Schneble v. Florida* (1972), 405 U.S. 427, 31 L. Ed. 2d 340, 92 S. Ct. 1056.) Even if a hearsay admission of a prejudicial nature is admitted and the jury is not instructed to disregard it, error in admitting such testimony is not reversible where there is no reasonable possibility that the jury would have acquitted the defendant had the statement not been admitted. *People v. Smith* (1973), 15 Ill. App. 3d 10, 14, 304 N.E.2d 50, 54.

In examining the evidence presented in this case in this light, it becomes apparent that omission of the erroneously admitted hearsay admission would have left a pattern of evidence such that there is no reasonable possibility that the jury would have acquitted the defendant.

The jury heard the testimony of Jim Price, describing the meeting

between Cain and McClellan the night before the mail carrier was shot, and his report of Cain's visit at 11 a.m. the next day together with Cain's statement that there had been a robbery involving a shooting by shotgun. Jody Akers told the jury of McClellan's arrival at Cain's apartment around 11 a.m. carrying a paper sack shaped like a shotgun and of her removing a shotgun from the garbage on Cain's back porch.

When the testimony of these two witnesses is combined with that of Robert Haas, and the facts concerning the mail carrier's death produced by investigators, the only possible basis for doubting McClellan's guilt would be doubt concerning Haas' truthfulness. However, cross-examination of Haas did not reveal any credible motive for him to lie and his testimony was corroborated in important details by that of other witnesses and in no way contradicted other than by his own first responses to the questions of police investigators. Haas explained these earlier responses as arising from a hesitancy to become involved, and in view of the circumstances of his presence at the scene of the crime, this explanation was reasonable.

■■ Accordingly, there was no reasonable grounds for doubting Haas' testimony, and that testimony showed beyond a reasonable doubt that McClellan was guilty of armed robbery and murder. The error complained of cannot have affected the jury verdict and therefore provides no basis for reversal of defendant's conviction.

The final matter complained of was the prosecutor's reference in his opening statement to an unrelated robbery. The record reflecting the language objected to is as follows:

> "PROSECUTOR: [The evidence will show that] McClellan struck up a conversation, introduced himself as Ronald and said that he lived next door with the Gonzalezes and that was understood and he interpreted that he was, in fact, a Gonzalez, but in any event he introduced himself and began to speak of a stickup.
>
> DEFENDANT MC CLELLAN: That is a lie.
>
> PROSECUTOR: As I say, the only evidence you will hear in this case is the sworn testimony from the witness stand.
>
> There, they discussed a stickup. That evening McClellan went out with Cain.
>
> ATTORNEY FOR DEFENDANT CAIN: Judge, I'm going to object to they discussed a stickup.
>
> THE COURT: Proceed with what you expect the evidence to show.
>
> PROSECUTOR: The evidence will show that Cain departed and returned with some money. The important thing is nine-thirty the next morning—

ATTORNEY FOR CAIN: Judge, I will object to that. Could I have a side bar, Judge?

THE COURT: Is this in the motion in limine?

ATTORNEY FOR CAIN: Absolutely.

PROSECUTOR: I am not going to get into that.

THE COURT: You just got into that.

The jury will disregard the last statement. It will be stricken from the record."

■■ No mention of this crime other than that in the prosecutor's opening statement occurred in the course of the trial. Accordingly, the reference to the robbery by the prosecutor was a purported recitation of evidence which was never presented and was therefore improper. (*People v. Weller* (1970), 123 Ill. App. 2d 421, 427, 258 N.E.2d 806, 809.) Moreover, because it referred to a matter which could not properly be entered into evidence, it was prejudicial. *People v. Brown* (1972), 3 Ill. App. 3d 1022, 1025, 279 N.E.2d 765, 767.

This statement was, however, immediately objected to and was stricken from the record and the jury was instructed to disregard it. Ordinarily, even prosecution statements that constitute prejudicial error may be cured by sustaining objections to them and striking them from the record (*People v. Jones* (1970), 47 Ill. 2d 135, 141, 265 N.E.2d 125, 128), but references to prior criminal acts have been recognized as particularly inflammatory and prejudicial, so that the error in introducing such statements into a closing argument cannot be so readily cured. *People v. Brown.*

Here, however, the statement in question occurred in an opening statement, so that its impact on the jury may well have faded by the time deliberations began, and that statement was rather vague and devoid of inflammatory details. Accordingly, its inflammatory tendency was greatly diminished and the action of the court in striking this statement and instructing the jury to disregard it cured this error.

■■■ In any event, even such inflammatory remarks as a reference to an admission of guilt by the defendant to the offense for which he is being tried where no such admission is proved at trial will not require reversal where there is no reasonable ground to believe that the jury's verdict was influenced by these remarks (*People v. Allen* (1959), 17 Ill. 2d 55, 63, 160 N.E.2d 818, 824). Because of the overwhelming evidence of guilt discussed above, there can be no reasonable ground to believe that the prosecutor's statement influenced the jury's verdict, so that statement does not constitute a ground for reversal.

■■ We have considered and rejected all of the defendant's claims of reversible error. In addition, quite aside from the merits of the situation,

defendant cannot escape the application of the doctrine of waiver. None of these alleged errors was included in defendant's written post-trial motion. Failure to do so precludes urging these errors on appeal. *People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, 857; *People v. Marshall* (1977), 50 Ill. App. 3d 615, 622, 365 N.E.2d 1122, 1127-28.

For these reasons, the judgment of the circuit court is affirmed.

Affirmed.

GOLDBERG, P. J., and O'CONNOR, J., concur.