# Illinois Official Reports

## Appellate Court

***People v. Trice*, 2017 IL App (4th) 150429**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN EDWARD TRICE, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-15-0429 |
| Filed | November 1, 2017 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 13-CF-1462; the Hon. Scott D. Drazewski, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Maria A. Harrigan, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Thomas R. Dodegge, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Appleton and Knecht concurred in the judgment and opinion. |

**OPINION**

¶ 1    In January 2015, a jury convicted defendant, John Edward Trice, of delivery of a controlled substance at a truck stop (720 ILCS 570/407(a)(2)(A) (West 2012)) and delivery of a controlled substance (720 ILCS 570/401(c)(2) (West 2012)). The trial court later sentenced him to seven years in prison.

¶ 2    Defendant appeals, arguing that his convictions ought to be reversed and his case remanded for a new trial because (1) the trial court erred by refusing to instruct the jury on entrapment, (2) trial counsel was ineffective for failing to request a jury instruction about paid informants, and (3) the State committed prosecutorial misconduct. We disagree with these contentions and affirm.

¶ 3                                    I. BACKGROUND

¶ 4    In October 2013, following a controlled drug transaction, defendant was charged with two Class 1 felonies: (1) delivery of a controlled substance at a truck stop (cocaine) (720 ILCS 570/407(a)(2)(A) (West 2012)) and (2) delivery of a controlled substance (cocaine) (720 ILCS 570/401(c)(2) (West 2012)). (We note there was a scrivener's error in the charging instrument, which indicated defendant was charged under section (b)(2) (720 ILCS 570/407(b)(2) (West 2012)) as opposed to section (a)(2)(A) (720 ILCS 570/407(a)(2)(A) (West 2012)).) The case proceeded to a jury trial in January 2015, and the following testimony was presented.

¶ 5    Beverly Throgmorton testified that she became a paid informant for the Bloomington police department in March 2013, following her arrest for possession of a crack pipe. She agreed to work for the Bloomington police department as an informant in exchange for the charges against her being dropped and, later, in exchange for money. She described her "steady employment" as working for the Bloomington police department. It paid her "a couple of thousand dollars." In her role as an informant for the Bloomington police, Throgmorton had bought drugs from 10 or more individuals.

¶ 6    Throgmorton had previously been addicted to crack cocaine for over 20 years, but at the time of defendant's trial, she had been sober for over 17 months. She had convictions for forgery, possession of a controlled substance, and retail theft, but she explained that her criminal behavior had all stemmed from her addiction to cocaine. She had begun a culinary career by taking classes through a local church, which led to her culinary arts degree and her currently managing a restaurant and catering company.

¶ 7    Throgmorton testified that she informed Bloomington police detective Stephen Brown in October 2013 that she could purchase crack cocaine from defendant. Throgmorton explained that she first met defendant because he lived in an apartment across from her brother. She told him she knew some truckers who bought crack, and he gave her his phone number. When she later told defendant that one of her truck drivers was coming to town, defendant told her that he could get whatever she wanted. Several days later, she called defendant and spoke with him on a speakerphone while Brown was in the room. She told defendant that she knew of a truck driver who wanted to purchase $400 worth of cocaine. Defendant said, "okay," and they arranged to meet at the Pilot gas station in Bloomington.

¶ 8    Throgmorton and Brown went to the gas station, but defendant was not there. She called defendant multiple times but learned he had left his phone somewhere. Defendant later called

her and said he was on his way and she should not leave. When he got there, she got into the back passenger seat of his vehicle. Another black male, whom she did not know, was in the car. Defendant handed her a bag of what she believed was crack cocaine, and she handed him $400 of marked bills she had received from Brown. She then returned to Brown's car and handed Brown the bag.

¶ 9 Brown field-tested the contents of the bag and determined it contained crack cocaine. (At trial, the parties stipulated that the contents of the bag tested positive for 1.3 grams of cocaine.)

¶ 10 Brown then contacted police officer Jared Johnson, who had followed defendant's car from the scene. Johnson pulled defendant's vehicle over and eventually arrested defendant and the vehicle's other occupant, Jovon Wilder. When the police searched Wilder, they found a small plastic bag of crack cocaine.

¶ 11 Detective Jared Bierbaum performed surveillance of the transaction at Pilot and met Johnson at the traffic stop. Bierbaum searched defendant's person and recovered a cellular phone and $200 in bills marked for the controlled transaction. Bierbaum later confirmed that the number to the cellular phone recovered from defendant matched the number that Throgmorton used to communicate with defendant to arrange the transaction.

¶ 12 At the Bloomington police department, Brown strip-searched defendant and recovered $200 from defendant's underwear. Brown later determined that cash was comprised of the remaining marked bills from the controlled transaction.

¶ 13 During Brown's interview of defendant, a recording that was ultimately played for the jury, defendant stated Throgmorton contacted him and asked if he could get her $400 worth of cocaine. He indicated that he "knew a guy." Defendant explained to Brown that he really did not know Wilder, but defendant's sister was dating Wilder. However, defendant called Wilder after Throgmorton asked him for the cocaine. He told Wilder that Throgmorton needed $200 worth of crack cocaine rather than $400 worth. A transaction was arranged, and on the date of the transaction, Wilder called defendant for a ride to Pilot to meet Throgmorton. When Wilder and defendant arrived at the gas station, Throgmorton got into his vehicle and placed $400 on the center console. Defendant stated he immediately pocketed $200 of the cash because he intended to use the money for gas. Wilder handed Throgmorton the cocaine, and Throgmorton exited the vehicle. When defendant noticed the police attempting to pull him over after the transaction, defendant grabbed the remaining $200.

¶ 14 Defendant's trial testimony conflicted with the above statement he gave to Brown following his arrest. Defendant testified that he was on social security disability and worked transporting children to his sister's day care center. He knew Throgmorton from having given her a ride home when it was raining. He gave her his phone number at her request. He had been to her apartment twice, and the second time they watched a movie.

¶ 15 Throgmorton called him and asked if he knew anybody, which he took to mean whether he knew someone from whom she could purchase drugs. Defendant testified he stated, "I know one guy, but I don't know."

¶ 16 On the day of the controlled transaction, defendant testified he left his cellular phone at his sister's day care, and his sister called him on his landline because Throgmorton had called his cellular phone several times. Defendant retrieved his phone and saw a text from Throgmorton that said, "I'm here," which defendant understood to mean that she was at Pilot. According to defendant's testimony, Throgmorton had called a few days before and told him she would be at

Pilot, and if he got a chance to go there, that was where she would be. Defendant responded to her text, stating, "I'm on my way." Defendant then received a call from Wilder, who said that he was walking to Pilot and asked defendant to pick him up because "that one girl called." Defendant responded, "What you want me to do about it," and Wilder stated, "I just want you to know, Man, she called me." Defendant agreed to give him a ride to Pilot but said that was all he would do.

¶ 17 Defendant picked up Wilder, and when they arrived at Pilot, Throgmorton entered the vehicle. Defendant did not say anything while she was in the vehicle, and he looked out the window the entire time. He testified he did not know what Wilder did, but "he had his hands back there." Defendant testified he "didn't even look that way," and he did not "see anything else, no drugs or nothing." Throgmorton then left the vehicle, and defendant told Wilder he wanted his gas money. After driving for a few minutes, defendant noticed the police attempting to pull him over. Defendant stated he pulled over and looked around the car as the officers approached. He noticed the cash and grabbed it.

¶ 18 Defendant testified he considered that he did Throgmorton a "favor" by giving Wilder a ride to Pilot. Defense counsel asked defendant, "And you were unwilling to answer her call and do any further work as far as finding drugs for her?" Defendant responded affirmatively. Defense counsel asked defendant if he understood Wilder's phone call to mean that Wilder was meeting Throgmorton to sell drugs to her, and defendant responded affirmatively. Defense counsel then asked, "And knowing that, you provided the ride anyway; is that right?" Defendant responded, "I just gave him a ride. I didn't know—it was his business whatever he was doing." Defense counsel later asked, "That was a ride which you understood was likely to lead to criminal activity; is that right?" Defendant responded, "I felt like this: I gave him a ride, but he's a grown man. Whatever he do [*sic*] is his business, as long as I'm not involved. I didn't put my hands on anything. I didn't touch anything at all." Defendant then denied receiving cash directly from Throgmorton or seeing or handling "any bag."

¶ 19 During closing argument, the State argued defendant was guilty either as a principal or by accountability because he either delivered the drugs himself or caused the drugs to be delivered by Wilder. The State argued defendant not only arranged the transaction, but he also intended to "rip off" Throgmorton by delivering only $200 worth of crack cocaine but still charging her $400. The prosecutor indicated that defendant's statement that he intended to keep the remaining $200 as gas money made him "chuckle" because gas was not so expensive that driving Wilder to Pilot would consume $200 worth of gas. The State also attempted to rehabilitate Throgmorton's credibility, stating:

> "This was a crack addict. This is a person that we know, or can infer from all that we know about her, is someone that had such a bad crack addiction, that she went from prostituting herself to get her next high, to—as she sat before you yesterday clean and sober for 17 months, working 60 hours a week in order to further her culinary career."

¶ 20 During its closing argument, defense counsel argued Throgmorton was not credible because she was biased due to her role as a paid informant and due to her addiction. On rebuttal, the State stated:

> "And another thing for you to consider, because obviously you have to weigh—you've heard conflicting stories, so you have to weigh believability. And one of the ways that you get to weigh believability is by your personal observations of the

demeanor, and the way the person conducted themselves, and what they said when they testified. [Throgmorton] looked healthy. [Throgmorton] looked clean.

[DEFENSE COUNSEL]: I'm going to object to the opinion.

THE COURT: All right. Counsel should refrain from stating personal opinions or beliefs. Ladies and gentlemen, personal opinions or beliefs of the attorneys are not proper and should not be considered by you in any way. Remember, you are the fact finder.

[STATE]: Under cross-examination [Throgmorton] did not falter. [Throgmorton] did not waiver. She stood by the same version of what happened throughout. And her version is believable, not only because of the way that she stated, because, you know, sometimes people are good liars, but she was believable because the facts support what she testify [*sic*] to."

¶ 21 Defendant requested a jury instruction on entrapment, but the trial court denied his request, concluding he had not admitted that he committed the crimes and he denied accountability. The jury returned guilty verdicts on both counts. After a March 2015 sentencing hearing, the court merged count II into count I and sentenced defendant to seven years in prison.

¶ 22 This appeal followed.

¶ 23                                                    II. ANALYSIS

¶ 24 On appeal, defendant argues that (1) the trial court erred by refusing to instruct the jury on entrapment, (2) trial counsel was ineffective for failing to request a jury instruction about paid informants, and (3) the State committed prosecutorial misconduct.

¶ 25                                                    A. Plain Error

¶ 26 The State argues defendant forfeited his arguments relating to the entrapment instruction and prosecutorial misconduct. Defendant concedes he forfeited his prosecutorial misconduct argument, but he requests plain-error review.

"Plain-error review is appropriate under either of two circumstances: (1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error'; or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Eppinger*, 2013 IL 114121, ¶ 18, 984 N.E.2d 475 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007)).

As a matter of convention, the first step in plain-error review is usually to ascertain whether an error occurred at all. *People v. Shaw*, 2016 IL App (4th) 150444, ¶ 69, 52 N.E.3d 728 (citing *People v. Bowens*, 407 Ill. App. 3d 1094, 1108, 943 N.E.2d 1249, 1265 (2011)). In this case, we choose to follow that convention and determine first whether defendant's claims of error have merit.

¶ 27                                          B. The Entrapment Instruction

¶ 28 Defendant argues the trial court committed plain error by refusing his request for a jury instruction on the affirmative defense of entrapment. We disagree.

¶ 29    A jury instruction on an affirmative defense is justified when, viewing the evidence in the light most favorable to the defendant, "slight evidence is presented that, if believed, establishes the elements of the defense." *People v. Couch*, 387 Ill. App. 3d 437, 443-44, 899 N.E.2d 618, 623 (2008). The supreme court recently clarified this standard, holding the appropriate inquiry is "whether there is *some evidence* in the record[,] *** not whether there *is some credible* evidence." (Emphases added and in original.) *People v. McDonald*, 2016 IL 118882, ¶ 25, 77 N.E.3d 26. "[W]hen the trial court *** determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *Id.* ¶ 42.

¶ 30    Section 7-12 of the Criminal Code of 2012, which defines entrapment (720 ILCS 5/7-12 (West 2012)), states the following:

> "A person is not guilty of an offense if his or her conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of that person. However, this [s]ection is inapplicable if the person was pre-disposed to commit the offense and the public officer or employee, or agent of either, merely affords to that person the opportunity or facility for committing an offense."

¶ 31    "A precondition to raising the entrapment defense is that the defendant must admit that a crime was committed and that he or she committed it." *People v. Gillespie*, 136 Ill. 2d 496, 501, 557 N.E.2d 894, 896 (1990). "The logical reasoning behind the long-standing entrapment defense rule is that it is both factually and legally inconsistent for a defendant to deny committing the offense and then to assert as a defense that he committed the offense, but only because of incitement or inducement by the authorities." *Id.* at 501, 557 N.E.2d at 897. Indeed, the nature of an affirmative defense assumes the underlying allegations are true. See *Affirmative Defense*, Black's Law Dictionary 482 (9th ed. 2009) ("A defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true.").

¶ 32    Defendant argues he "sufficiently admitted the elements of the offense for purposes of the instruction," citing *People v. Walker*, 267 Ill. App. 3d 454, 460, 641 N.E.2d 965, 970 (1994). In *Walker*, the defendant was charged with delivery of cocaine by accountability. The First District Appellate Court concluded the defendant was entitled to an entrapment defense despite his denial of witnessing the transaction or knowledge of whether the sale was completed. *Id.* at 457, 460, 641 N.E.2d at 968, 970. The court held that the "defendant's testimony did not constitute a denial of an essential element of the crime. Although defendant did offer conflicting statements throughout his testimony, when considering the evidence in the light most favorable to defendant, the 'slight evidence' standard *** was satisfied." *Id.* at 460, 641 N.E.2d at 970. We disagree with the First District.

¶ 33    To be guilty of the crime of unlawful delivery by accountability, a defendant, either before or during the commission of that offense, and with the intent to promote or facilitate that commission, must aid, abet, agree, or attempt to aid another person in the planning or commission of that offense. See 720 ILCS 5/5-2(c) (West 2012). A defendant cannot claim that he admitted intentionally assisting with a delivery when he testifies that he did not know whether the delivery would occur. We thus decline to follow *Walker* because its holding is inconsistent with *Gillespie*, which held a defendant must admit committing the underlying

crime (*Gillespie*, 136 Ill. 2d at 501, 557 N.E.2d at 896). Admission of the crime necessarily means the defendant admitted that he committed each element of the crime.

¶ 34 Further, the "slight evidence" test does not apply to the question of whether a defendant admitted he committed the crime, which is the precondition to considering whether an entrapment instruction is warranted. Instead, the "slight evidence" test on the question of whether an entrapment instruction is warranted applies only *after* a defendant has admitted that (1) a crime was committed and (2) he committed it. Only after that threshold has been crossed should the trial court assess whether the defendant has presented "slight evidence" demonstrating that he was induced by the State to commit a crime that he was not predisposed to commit.

¶ 35 Accordingly, we must first consider whether defendant satisfied this precondition by admitting he committed (by accountability) unlawful delivery of a controlled substance (720 ILCS 570/401(c)(2) (West 2012)) and unlawful delivery of a controlled substance at a truck stop (720 ILCS 570/407(a)(2)(A) (West 2012)). We conclude he did not.

¶ 36 Defendant's trial testimony did not constitute an admission to these crimes either as a principal or by accountability because defendant unequivocally denied knowing whether a delivery would occur. The fact that his initial statement to Detective Brown was inconsistent with his trial testimony is of no import. Even if defendant admitted the crime in his initial statement, his subsequent trial testimony, denying that he committed the crime, overrides his original admission for purposes of determining whether an entrapment instruction is warranted.

¶ 37 Were we to allow the entrapment instruction here, our decision would defy the logic of the rule because defendant would be in the position of both denying the commission of the crime and also claiming that he was entrapped into committing it. Because defendant unequivocally denied at trial that he knowingly delivered or knowingly assisted with the delivery of the crack cocaine, the trial court did not abuse its discretion by refusing defendant's request for an entrapment instruction.

¶ 38 C. The Informant Instruction

¶ 39 Defendant next argues his trial counsel was ineffective for failing to request that the jury be instructed to view the testimony of a paid informant with caution. We disagree.

¶ 40 "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." (Internal quotation marks omitted.) *People v. Veach*, 2017 IL 120649, ¶ 30; see also *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Veach*, 2017 IL 120649, ¶ 30. "A 'reasonable probability' is defined as 'a probability sufficient to undermine confidence in the outcome.' " (Internal quotation marks omitted.) *Id.*

¶ 41 "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81, 902 N.E.2d 571, 589 (2008).

Generally, juries are given the relevant Illinois Pattern Jury Instructions (IPI). *People v. Rodriguez*, 387 Ill. App. 3d 812, 822, 901 N.E.2d 927, 937 (2008).

> "[I]f the pattern jury instructions do not contain an instruction on a subject on which the trial court determines that the jury should be instructed, the court *may* tender a nonpattern instruction to the jury as long as it is simple, brief, impartial, and free from argument." (Emphasis added.) *People v. Buck*, 361 Ill. App. 3d 923, 942, 838 N.E.2d 187, 203 (2005).

However, "[a] trial court does not exceed its discretion by refusing to give a non-IPI instruction if there is an applicable IPI instruction or the essence of the refused instruction is covered by other instructions." *Id.* at 942-43, 838 N.E.2d at 203.

¶ 42    There is no IPI instruction cautioning the jury about the credibility of a paid informant's testimony.

¶ 43    In support of his argument, defendant refers to a trend among the federal courts favoring "informant instructions." Citing *United States v. Luck*, 611 F.3d 183, 187 (4th Cir. 2010), defendant argues, "in cases involving uncorroborated accounts by confidential informants, an 'informant instruction' is 'always mandatory.' " However, though *Luck* cites other circuits that have come to that conclusion, the *Luck* court expressly declined to hold informant instructions were mandatory in any case. *Id.* at 188; see also *United States v. Bosch*, 914 F.2d 1239, 1247 (9th Cir. 1990); *United States v. Hill*, 627 F.2d 1052, 1054-55 (10th Cir. 1980); *United States v. Garcia*, 528 F.2d 580, 587-88 (5th Cir. 1976); *United States v. Griffin*, 382 F.2d 823, 828 (6th Cir. 1967) (each holding an informant instruction is mandatory when an informant's testimony is uncorroborated by other evidence). Instead, the *Luck* court determined defense counsel was ineffective because, based upon federal rules, a reasonable attorney would have requested an informant instruction due to the lack of evidence corroborating the informant's testimony. *Luck*, 611 F.3d at 188.

¶ 44    Notwithstanding this trend among the federal courts of appeal, a special jury instruction about informants is contrary to Illinois law. This court, as well as the Fifth District, has already addressed this exact argument, albeit in unpublished orders. See *People v. Powell*, 2015 IL App (5th) 120258-U, ¶¶ 117-23; *People v. Lockett*, 2014 IL App (4th) 120440-U, ¶¶ 31-35; *People v. Hill*, 2014 IL App (4th) 130276-U, ¶¶ 34-40. In each case, the court concluded trial counsel was not ineffective for failing to request a non-IPI informant instruction. We reach the same conclusion.

¶ 45    The supreme court has specifically held that "the credibility of a government informant, as with any other witness, is a question for the jury." (Internal quotation marks omitted.) *People v. Evans*, 209 Ill. 2d 194, 213, 808 N.E.2d 939, 949 (2004). Illinois Pattern Jury Instructions, Criminal, No. 1.02 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 1.02), which was given in this case, informs the jury of its responsibility to judge the credibility of each witness, taking into account any "interest, bias, or prejudice" and "the reasonableness of [the] testimony considered in the light of all the evidence in the case." Giving IPI Criminal 4th No. 1.02 was sufficient to instruct the jury to consider any potential interest or bias when assessing Throgmorton's credibility. Thus, even if defense counsel had requested an informant instruction, the trial court would not have abused its discretion by refusing to tender it. See *Buck*, 361 Ill. App. 3d at 942-43, 838 N.E.2d at 203.

¶ 46    We also note that IPI Criminal 4th No. 3.00, Introduction, "disapproves of instructions which comment on particular types of evidence."

> "[C]ourts are under a general obligation to avoid giving instructions which unduly emphasize one part of the evidence in a case[ ] and are not required to give an instruction that would provide the jury with no more guidance than that available to them by application of common sense." (Internal quotation marks omitted.) IPI Criminal 4th No. 3.00, Introduction (quoting *People v. McClellan*, 62 Ill. App. 3d 590, 595, 378 N.E.2d 1221, 1225 (1978)).

We seriously doubt that any sensible jury, using common sense, needs to be instructed to view paid informants with caution. This is especially true where, as here, defense counsel addressed the informant's potential bias and interests on cross-examination and in closing argument.

¶ 47    Thus, defendant fails to persuade us that his trial counsel's performance was objectively unreasonable due to counsel's failure to request an informant instruction. Illinois law neither encourages nor requires it. Because the trial court would not have abused its discretion by refusing to tender the proposed informant instruction, defense counsel was not ineffective for failing to request it.

¶ 48                     D. Claims of Prosecutorial Misconduct

¶ 49    Last, defendant argues the State engaged in prosecutorial misconduct "throughout [defendant's] entire trial." Particularly, defendant takes issue with the State's (1) direct examination of Throgmorton and (2) statements in closing argument relating to the credibility and character of Throgmorton and defendant. Defendant concedes he forfeited this argument, but he requests plain-error review.

¶ 50    "[A] pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine." *People v. Johnson*, 208 Ill. 2d 53, 64, 803 N.E.2d 405, 412 (2003).

> "[P]ervasive prosecutorial misconduct which is designed to encourage[ ] the jury to return a verdict grounded in emotion, and not a rational deliberation of the facts [citation], adversely affects a defendant's substantial right to a fair trial, and in our view certainly qualifies as a structural defect affecting the framework within which the trial proceeds. [Citations.]" (Internal quotation marks omitted.) *Id.* at 84-85, 803 N.E.2d at 424.

Moreover, pervasive prosecutorial misconduct can undermine the "trustworthiness and reputation of the judicial process, affecting the very integrity of the judicial process itself." (Internal quotation marks omitted.) *Id.* at 85, 803 N.E.2d at 424.

¶ 51    We choose to begin our inquiry by considering whether the State committed prosecutorial misconduct either in its direct examination of Throgmorton or in its closing argument.

¶ 52                          1. *The Direct Examination*

¶ 53    Defendant contends that the State committed misconduct by asking Throgmorton questions on direct examination relating to her prior drug use, her decision to quit using drugs, and her activities since quitting. We disagree.

¶ 54    At trial, defense counsel objected to this line of questioning on relevance grounds, and the trial court overruled the objection, finding the testimony was admissible for the limited purpose of assessing Throgmorton's credibility and background.

¶ 55    Generally, a witness's credibility is relevant, and the State may, on direct examination, elicit testimony explaining the facts regarding a potential basis for impeachment. See *People v. Nitz*, 143 Ill. 2d 82, 120, 572 N.E.2d 895, 912 (1991) ("under [Illinois] Supreme Court Rule 238(a) [(eff. Apr. 11, 2001)], a party may introduce impeachment evidence regarding its own witnesses to lessen the prejudicial effect"). Throgmorton's prior drug addiction was a probable basis for impeachment. Indeed, defense counsel questioned Throgmorton about her prior addiction and sobriety on cross-examination and discussed her prior addiction in closing argument. Defendant never explains why the State's anticipatory disclosure of these facts and attempt to "pull the sting" was inadmissible or improper, and we deem the State's direct examination entirely appropriate.

¶ 56                      *2. The State's Comments During Closing Argument*

¶ 57    Defendant argues plain error occurred when the State "vouched for the credibility of its key witness while improperly disparaging [defendant]." We disagree.

¶ 58    Defendant takes issue with the following statements by the State during closing argument:

> "This was a crack addict. This is a person that we know, or can infer from all that we know about her, is someone that had such a bad crack addiction, that she went from prostituting herself to get her next high, to—as she sat before you yesterday clean and sober for 17 months, working 60 hours a week in order to further her culinary career."

Additionally, defendant complains of the following remarks during the State's rebuttal:

> "And another thing for you to consider, because obviously you have to weigh—you've heard conflicting stories, so you have to weigh believability. And one of the ways that you get to weigh believability is by your personal observations of the demeanor, and the way the person conducted themselves, and what they said when they testified. [Throgmorton] looked healthy. [Throgmorton] looked clean.
>
> [DEFENSE COUNSEL]: I'm going to object to the opinion.
>
> THE COURT: All right. Counsel should refrain from stating personal opinions or beliefs. Ladies and gentlemen, personal opinions or beliefs of the attorneys are not proper and should not be considered by you in any way. Remember, you are the fact finder.
>
> [STATE]: Under cross-examination [Throgmorton] did not falter. [Throgmorton] did not waiver. She stood by the same version of what happened throughout. And her version is believable, not only because of the way that she stated, because, you know, sometimes people are good liars, but she was believable because the facts support what she testify [*sic*] to."

Defendant also complains of the State's use of the phrase "rip off" when discussing the fact that Throgmorton agreed to purchase $400 worth of crack cocaine but was only delivered $200 worth of the drug. Finally, defendant complains of the prosecutor's remark that he "chuckled" when he heard defendant's statement that he kept $200 for gas money.

¶ 59    "Closing arguments are viewed in their entirety, and the challenged remarks are considered within the context in which they were conveyed." *People v. Lewis*, 2017 IL App (4th) 150124, ¶ 67, 78 N.E.3d 527. " 'During closing argument, prosecutors are granted wide latitude,' but when a prosecutor expresses 'personal beliefs or opinions or invoke[s] the State's Attorney's office's integrity, to vouch for a witness's credibility,' the prosecutor breaches that latitude."

*Id.* (quoting *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 66, 44 N.E.3d 632). While a prosecutor may not personally vouch for a witness, the credibility of witnesses may be argued in closing argument. See *People v. Richardson*, 123 Ill. 2d 322, 356, 528 N.E.2d 612, 625 (1988).

¶ 60     "If no objection was made when the prosecutor vouched for the credibility of the State's witnesses, it will constitute plain error only if the comments were so inflammatory as to deny the defendant a fair trial or so flagrant as to threaten deterioration of the judicial process." *People v. Taylor*, 2015 IL App (4th) 140060, ¶ 39, 44 N.E.3d 1234. Further, "a defendant may not claim prejudice from comments by the prosecutor when those comments were invited by defendant's argument." *Richardson*, 123 Ill. 2d at 356, 528 N.E.2d at 625.

¶ 61     In *Wilson*, 2015 IL App (4th) 130512, ¶ 66, 44 N.E.3d 632, this court wrote that "[t]he question of whether a prosecutor's statements in closing argument necessitate a new trial is a legal question reviewed *de novo*." In support, this court cited the decision of the Illinois Supreme Court in *People v. Wheeler*, 226 Ill. 2d 92, 121, 871 N.E.2d 728, 744 (2007). However, we note that the First District Appellate Court recently spoke of a conflict regarding the correct standard of review. In *People v. Anderson*, 2017 IL App (1st) 122640, 72 N.E.3d 726, the First District cited an earlier decision of the Illinois Supreme Court in *People v. Hudson*, 157 Ill. 2d 401, 441, 626 N.E.2d 161, 178 (1993), where the supreme court "suggested that [an appellate court] should review this issue for an abuse of discretion." *Anderson*, 2017 IL App (1st) 122640, ¶ 109, 72 N.E.3d 726. Other appellate court decisions have raised the same concern. See *People v. Crawford*, 2013 IL App (1st) 100310, ¶ 139, 2 N.E.3d 1143; *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 32, 12 N.E.3d 715; *People v. Hayes*, 409 Ill. App. 3d 612, 624, 949 N.E.2d 182, 192-93 (2011). However, like the court in *Anderson*, "[w]e need not take a position in this case, as defendant's claim fails under either standard." *Anderson*, 2017 IL App (1st) 122640, ¶ 109, 72 N.E.3d 726.

¶ 62     The prosecutor did not personally vouch for Throgmorton's credibility in closing argument; he merely reiterated her testimony and pointed out that her story had not changed throughout the proceedings. Further, the prosecutor's comments on rebuttal can be reasonably characterized as a response to defense counsel's closing argument about Throgmorton's credibility. Defendant cannot claim prejudice where his own defense counsel invited the State's remarks. *Richardson*, 123 Ill. 2d at 356, 528 N.E.2d at 625.

¶ 63     The prosecutor also did not improperly disparage defendant by stating defendant "ripped [Throgmorton] off." "[W]hile it may be improper to disparage a defendant, it is not prejudicial error if such a characterization was based on the evidence or a reasonable inference therefrom." *People v. Arbuckle*, 75 Ill. App. 3d 826, 837, 393 N.E.2d 1296, 1304 (1979).

¶ 64     Also, while the prosecutor's statement that he "chuckled" comes closer to an improper personal opinion on defendant's credibility, defendant fails to persuade that the comment, to which defense counsel did not object, was "so inflammatory as to deny the defendant a fair trial or so flagrant as to threaten deterioration of the judicial process." *Taylor*, 2015 IL App (4th) 140060, ¶ 39, 44 N.E.3d 1234. Putting the comment in context, it was followed by the common sense observation that giving Wilder a ride to Pilot could not possibly have consumed $200 worth of gas. Thus, the evidence did not support defendant's assertion that he kept $200 for gas money. The State was entitled to argue the credibility of defendant's explanations as long as the argument was reasonably based upon the evidence or inferences drawn therefrom. That standard was met here.

¶ 65    In closing this discussion about defendant's claim that the prosecutor's arguments were improper, we reiterate what this court wrote in *People v. Hubner*, 2013 IL App (4th) 120137, ¶ 33, 986 N.E.2d 246, wherein we deemed the prosecutor's argument in that case to be entirely appropriate:

> "In so concluding, we reiterate what this court recently wrote in *People v. Montgomery*, 373 Ill. App. 3d 1104, 1118, 872 N.E.2d 403, 415 (2007), and *Dunlap*, 2011 IL App (4th) 100595, ¶ 28, 963 N.E.2d 394, that 'trying felony cases before a jury "ain't beanbag." ' We added the following in *Dunlap*:

> > '[F]elony criminal trials are serious matters with high stakes, and we expect advocates in our adversarial system of justice—both prosecutors and defense attorneys—to "use all of their forensic skills to persuade the jury of the wisdom or justice of their respective positions." [Citation.] We continue to be disinclined to become the "speech police" by imposing unnecessary restrictions upon closing arguments in criminal cases, and we encourage counsel to vigorously advocate for their position.' *Id.*"

¶ 66                                    III. CONCLUSION

¶ 67    For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment against defendant as costs of this appeal. 55 ILCS 5/4-2002 (West 2016).

¶ 68    Affirmed.